RYAN, Judge, delivered the opinion of the Court.
The issue before us is whether the evidence adduced at trial demonstrated that Appellant’s statements on government, race, and religion were made under circumstances legally sufficient to criminalize his conduct under Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).[1] Under the specific circumstances of this ease, we hold that the evidence presented by the Government was insufficient as a matter of law to meet the element of either service discrediting behavior or conduct prejudicial to good order and discipline under Article 134, UCMJ.[2]
I. Background
Appellant’s case has wound through the military justice system for almost eight years. During that time several of the original offenses, which both shared a factual basis with the offense in question today and were central to the Government’s theory of the case, were either mooted by the military judge’s findings of not guilty or have been modified or dismissed by the United States Army Court of Criminal Appeals (CCA). This procedural history is important, as it frames the narrow issue presently before this Court.
A. Procedural History
Appellant was charged with disobeying an officer, violation of an Army regulation by attending a Ku Klux Klan rally, violation of an Army regulation by wrongfully recruiting other members of the Army in extremist activity, violation of an Army regulation by distributing extremist literature, making a false official statement, larceny of property of some value less than $100, and finally:
wrongfully advoeat[ing] anti-government and disloyal sentiments, and encourag[ing] participation in extremist organizations while identifying himself as a “US Army Paratrooper” on an America OnLine [AOL] Profile and advocating] racial intolerance by counseling and advising individuals on racist views and that under the *444 circumstances, the [Appellant’s] conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit to the armed forces
in violation of Articles 90, 92, 107, 121, and 134, UCMJ, 10 U.S.C. §§ 890, 892, 907, 921, 934 (2000).
Appellant pleaded guilty to disobeying an officer in violation of Article 90, UCMJ, and to stealing a watehband worth $2.99 in violation of Article 121, UCMJ. He pleaded not guilty to the remaining charges.
Appellant was tried by military judge alone and was found not guilty of the Article 92, UCMJ, charges associated with recruiting servieemembers into extremist activity and distributing extremist literature, and guilty of violating Article 92, UCMJ, by attending a Ku Klux Klan rally, violating Article 107, UCMJ, by making a false official statement in which he denied having extremist views, and violating Article 134, UCMJ. Appellant was sentenced to a bad-conduct discharge, confinement for eight months, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the adjudged sentence.
On appeal, the CCA held that the evidence was legally insufficient to affirm the conviction for a violation of Article 92, UCMJ, based on attending a Ku Klux Klan rally in violation of an Army regulation, but affirmed the remaining charges. United States v. Wilcox (Wilcox 1), No. ARMY 20000876, slip op. at 2 (A.Ct.Crim.App. Nov. 4, 2004) (unpublished). After this, the only offense remaining that imposed criminal culpability on Appellant for expressing his views was the Article 134, UCMJ, specification.
This Court initially granted review of Appellant’s case to determine whether the Article 134, UCMJ, offense was unconstitutionally overbroad as charged. United States v. Wilcox (Wilcox II), 61 M.J. 462 (C.A.A.F. 2005). After hearing oral argument this Court held that:
Upon further consideration of the granted issue, we note that many of the facts at issue in the constitutional challenge to the Article 134 offense were at issue with respect to the offenses charged under Article 92. In light of the fact that the closely related Article 92 offenses were resolved favorably to Appellant, it is not apparent which facts were relied upon by the court below for purposes of addressing Appellant’s constitutional challenge to his Article 134 conviction. Under these circumstances, we conclude that it is appropriate to remand this case for further consideration of the following by the court below:
(1) The constitutionality of the Article 134 findings. See, e.g., Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); United States v. Brown, 45 M.J. 389 (C.A.A.F.1996); United States v. Priest, 21 C.M.A. 564, 45 C.M.R. 338, 1972 WL 14190 (1972).
(2) The legal and factual sufficiency of the evidence of the Article 134 findings. See Article 66(c), 10 U.S.C. § 866(c) (2000).
United States v. Wilcox (Wilcox III), 62 M.J. 456, 457 (C.A.A.F.2006).
On remand, the CCA held that the evidence was “legally and factually sufficient to support appellant’s conviction based on the [Article 134 specification], except that part of the specification alleging appellant encouraged participation in extremist organizations.” United States v. Wilcox (Wilcox IV), No. ARMY 20000876, slip op. at 3 (A.Ct. Crim.App. Dec. 22, 2006). Based on this holding, the specification remaining alleged that Appellant “did, at or near Fort Bragg, North Carolina, between on or about 28 April 2000 and 30 May 2000”: (1) “wrongfully advocate anti-government and disloyal sentiments while identifying himself as a ‘U.S. Army Paratrooper’ in an America Online profile, and advocate racial intolerance by counseling and advising individuals on racist views”; (2) “which conduct was, under the circumstances, prejudicial to good order and discipline and service discrediting.” Id. slip op. at 11.
The CCA held that the facts, taken in the light most favorable to the Government, showed that Appellant did make statements on the Internet that were anti-government and disloyal as well as statements that promoted extreme racial intolerance. Id. slip *445 op. at 7. The CCA also held that those statements had a tendency to discredit the service or to be prejudicial to good order and discipline because “[y]oung, immature soldiers surfing the internet and discovering a U.S. Army paratrooper’s profile advocating anti-government sentiments and extreme racist views could believe such disloyalty and racial intolerance is entirely acceptable conduct in our Army” and because “members of the general public have access to [Appellant's publicly-posted comments, and upon reading them, may tend to find the Army— as represented by [Appellant — a disreputable institution, or one disserving [sic] less than full public esteem and respect.” Id. slip op. at 8-9.
While Appellant was initially charged, inter alia, with multiple violations of Article 92, UCMJ, associated with recruiting service-members into extremist activity, distributing extremist literature, attending a Ku Klux Klan rally, and a violation of Article 134, UCMJ, for the Internet communications discussed above, at the end of consideration by the military judge at trial and the CCA, the only remaining charge related to extremist views was a remnant of the original Aticle 134, UCMJ, offense. Thus, the sole issue presently before the Court is whether the evidence is legally sufficient to support the second element of the attenuated version of the charged Article 134, UCMJ, offense remaining. We hold that it is not.
B. Factual Background
Appellant first came to the attention of Army Criminal Investigative Division (CID) when a civilian police officer noticed an online profile containing racist views in which the author identified himself as a “US Army Paratrooper.” The civilian officer notified CID at Port Bragg. Army CID viewed two profiles assigned to Appellant’s AOL e-mail address. The first, a general AOL profile, listed Appellant’s occupation as “Amy/Paratrooper” and listed as a “personal quote” that “ ‘[w]e must secure the existence of our people and a future for white children.’ THE 14 WORDS — written by imprisoned matyr [sic] David Lane____”
The second, a love.aol.com profile, stated, inter alia, that Appellant’s occupation was an Amy paratrooper, that he was single, seeking a “[fjemale for a casual or serious relationship” and was:
a Pro-White activist doing what I can to promote the ideals of a healthier environement [sic]. I do not base my deeds on Hate [sic], but that of love for my folk’s women & children. Political Affiliation is none — This government is not worth supporting in any of its components. Natures [sic] and God’s laws are eternal — Love your own kind & fight for your own kind. There’s no “HATE” in that!
A CID agent, Investigator Sturm, created an AOL instant messenger account and began conversing with Appellant via that service and eventually via e-mail. Sturm posed as a young female interested in the white supremacist movement. During their online conversations Appellant made racist statements and encouraged her to read various racist and anarchist websites and books. Sturm recorded her online conversations and e-mails with Appellant. She compiled a synopsis of those conversations which was admitted at trial along with the original transcripts of the conversations and e-mails.
At trial, Sturm testified in detail about her Internet communications with Appellant. She testified about Appellant’s views, and also testified that Appellant had posted on various websites catering to those with racist and anarchist views, identified himself as a member of the armed forces, and espoused similar views in message forums — those posts were not admitted as evidence, based on the military judge sustaining the defense’s hearsay objection. Eventually, Appellant invited Sturm to a white supremacist rally and rock concert, which she did not attend. Sturm did not testify that Appellant encouraged her to join a white supremacist group, overthrow the government, or take any specific action towards or against any person.
The Government’s evidence concerning the Aticle 134, UCMJ, charge as it remains today consists of the testimony of Sturm, the evidence she gathered in the course of her online conversations, including Appellant’s *446 online profiles, and expert testimony that confirmed Appellant’s statements in his online profiles, in particular the reference to the “14 Words,” were consistent with the white supremacist movement. No evidence was introduced as to either the actual or potential adverse impact of Appellant’s online profile or statements on good order and discipline or to the actual or potential discredit to the armed forces. In contrast, the defense introduced evidence from soldiers in Appellant’s unit that he had good working relationships with minorities in the unit and that there was no evidence that his racist views adversely affected his military performance or his unit.
At trial, the Government argued that Appellant was a racist, distributed racist material to his fellow soldiers, and attempted to recruit individuals into extremist activities. Specifically, Government counsel stated that the Article 134, UCMJ, offense was proven because “the accused, while holding himself out as a member of the United States Army ... recruited others into activities involving racial intolerance” and because he violated Army Regulation 600-20, which prohibits participation in extremist organizations. In arguing before the military judge regarding the evidence to support the Article 134, UCMJ, offense, trial counsel focused solely on manifestations of the message expressed in the speech captured in the now-defunct Article 92, UCMJ, charges.
Appellant has long since been acquitted of distributing racist materials, attending racist rallies, and recruiting servicemembers into extremist activities. While Sturm’s testimony and Appellant’s online profiles show that Appellant held beliefs that are both disturbing and inconsistent with Department of Defense policies regarding racial equality and other matters, that alone is insufficient under the facts of this ease to impose criminal sanctions under Article 134, UCMJ.
II. Analysis
We review questions of legal sufficiency de novo as a matter of law. United States v. Young, 64 M.J. 404, 407 (C.A.A.F.2007). The test for legal sufficiency is “whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.” United States v. Dobson, 63 M.J. 1, 21 (C.A.A.F.2006) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). As reflected in our remand to the Court of Criminal Appeals, see supra at 444, this case involves legal sufficiency in the context of First Amendment considerations.
The First Amendment provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I. This protection permits the expression of ideas, even the expression of ideas the vast majority of society finds offensive or distasteful. See Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (citing Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting)); R.A.V. v. St. Paul, 505 U.S. 377, 395-96, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The sweep of this protection is less comprehensive in the military context, given the different character of the military community and mission. Parker v. Levy, 417 U.S. 733, 758, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); United States v. Priest, 45 C.M.R. 338, 344-46, 21 C.M.A 564, 570-72 (1972); United States v. Gray, 20 C.M.A. 63, 66, 42 C.M.R. 255, 258 (1970). But even under the potentially less protective First Amendment right afforded to servicemembers, and despite the offensive nature of Appellant’s views and communications, we hold that the evidence is legally insufficient to support Appellant’s conviction for the amended and remaining violation of Article 134, UCMJ.
A. Free Speech and Article 13k, UCMJ
Appellant’s sole remaining conviction rests clearly on the offensive message of racial intolerance and dissatisfaction with the government expressed in his online profiles, communications with Sturm, and communications with others on Internet message boards, as relayed by Sturm. The substantive messages conveyed therein, while distasteful, constitute Appellant’s ideas on issues of social and political concern, which has *447 been recognized as “the core of what the First Amendment is designed to protect.” Black, 538 U.S. at 365, 123 S.Ct. 1536 (finding that the act of burning a cross may be a form of political speech); see also United States v. Brown, 45 M.J. 389, 398 (C.A.A.F. 1996) (recognizing that political speech “ ‘occupies the core of the protection afforded by the First Amendment’ ” (quoting McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995))).
Parker v. Levy reiterated the point that differences between the military community and the civilian community result in military law that “regulate[s] aspects of the conduct of members of the military which in the civilian sphere are left unregulated.” 417 U.S. at 749, 94 S.Ct. 2547. But the Supreme Court upheld Article 134, UCMJ, against constitutional attack for vagueness and over-breadth in light of the narrowing construction developed in military law through the precedents of this Court and limitations within the Manual for Courts-Martial (MCM) itself. Id. at 752-61, 94 S.Ct. 2547. As such, a limited Article 134, UCMJ, does not make every “irregular or improper act” a court-martial offense and does not reach conduct that is only indirectly or remotely prejudicial to good order and discipline. MCM pt. IV, para. 60.c.(2)(a); see also William Winthrop, Military Law and Precedents 723-24 (2d ed.1920 reprint) (commenting on Article 62 of the American Articles of War, the predecessor to Article 134, UCMJ, and stating that to be punishable, acts prejudicial to good order and discipline “must have been committed under such circumstances as to have directly offended against the government and discipline of the military state”). If it were otherwise, the forces of narrowing interpretation that saved Article 134, UCMJ, from constitutional challenge in Parker v. Levy would fail.
Our jurisprudence on charged violations of Article 134, UCMJ, involving speech thus recognizes the importance of the context of that speech. See United States v. Daniels, 19 C.M.A. 529, 534-35, 42 C.M.R. 131, 136-37 (1970) (holding that although a request for mast would generally be lawful, under the circumstances, the appellant’s encouraging other servieemembers to request mast and refuse to fight in Vietnam was punishable under Article 134, UCMJ); see also infra at 20-22.
Consistent with the focus on context necessary to establish a violation of Article 134, UCMJ, while speech that would be impervious to criminal sanction in the civilian world may be proscribed in the military, this Court has long recognized that when assessing a criminal violation implicating the First Amendment:
the proper balance must be struck between the essential needs of the armed services and the right to speak out as a free American. Necessarily, we must be sensitive to protection of “the principle of free thought — not free thought for those who agree with us but freedom for the thought that we hate.”
Priest, 21 C.M.A. at 570, 45 C.M.R. at 344 (quoting United States v. Schwimmer, 279 U.S. 644, 654-55, 49 S.Ct. 448, 73 L.Ed. 889 (1929) (Holmes, J., dissenting)).
Prior to applying this balancing test to a charged violation of Article 134, UCMJ, involving speech, two threshold determinations must be made. First, the speech involved must be examined to determine whether it is otherwise protected under the First Amendment. Second, the Government must have proved the elements of an Article 134, UCMJ, offense.
1. Unprotected speech
No one disputes that servieemembers enjoy some measure of the right to free speech granted by the First Amendment. See Parker, 417 U.S. at 758, 94 S.Ct. 2547; Brown, 45 M.J. at 395; Gray, 20 C.M.A. at 66, 42 C.M.R. at 258. However, the right to free speech is not absolute, and some speech— e.g., dangerous speech, obscenity, or fighting words — is not protected by the First Amendment, regardless of the military or civilian status of the speaker. Brown, 45 M.J. at 395 (citing Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Chaplinsky v. New *448 Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L. Ed. 1031 (1942)).
The test for dangerous speech in the civilian community is whether “the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.” Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Under the standard applicable to the civilian world, “clear and present danger” extends to speech “directed to inciting or producing imminent lawless action ... likely to incite or produce such action.” Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). A lower standard pertains in the military context, where dangerous speech is that speech that “interferes with or prevents the orderly accomplishment of the mission or presents a clear danger to loyalty, discipline, mission, or morale of the troops.” Brown, 45 M. J. at 395.[3]
2. Sufficiency of proof for a charged violation of Article 13h, UCMJ, in the First Amendment context
For any offense charged under Article 134, UCMJ, clauses 1 or 2, the government must prove: (1) that the accused did a certain act, and (2) that the act was, under the circumstances, to the prejudice of good order and discipline or was of a nature to bring discredit upon the armed forces. MCM pt. IV, para. 60.b. To satisfy the due process requirements of the Fifth Amendment, the Government must prove beyond a reasonable doubt every element of the charged offense. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Jackson v. Virginia, 443 U.S. at 321, 99 S.Ct. 2781. In the context of the First Amendment, in order to meet the second element for conduct charged under a “prejudice of good order and discipline” theory, we have required that the prosecution show a “‘reasonably direct and palpable’” connection between an appellant’s statements and the military mission. See Priest, 21 C.M.A. at 569, 45 C.M.R. at 343 (citation omitted); see also Brown, 45 M.J. at 396 (“‘[Ojur national reluctance to inhibit free expression dictates that the connection between statements or publications involved and their effect on military discipline be closely examined’.” (quoting Priest, 21 C.M.A. at 569-70, 45 C.M.R. at 343-44)). This Court has not directly addressed the connection needed between an appellant’s statements and the military mission in the context of speech alleged to be “service discrediting.” We note that the Government has cited no case in which this Court has upheld a conviction in a contested case based upon a violation of Article 134, UCMJ, for service discrediting speech solely because the speech would be offensive to many or most. We conclude that a direct and palpable connection between speech and the military mission or military environment is also required for an Article 134, UCMJ, offense charged under a service discrediting *449 theory. If such a connection were not required, the entire universe of servicemember opinions, ideas, and speech would be held to the subjective standard of what some member of the public, or even many members of the public, would find offensive. And to use this standard to impose criminal sanctions under Article 134, UCMJ, would surely be both vague and overbroad. Cf. United States v. O’Connor, 58 M.J. 450, 455 (C.A.A.F.2003) (“[T]he connection between any conduct protected by the First Amendment and its effect in the military environment [must] be closely examined. The absence of ... record development concerning the service-discrediting character of [the] conduct precludes us from engaging in that ‘close examination’ in the present case.”) (citation omitted).
3. Balancing test may be mooted
If the speech is otherwise protected by the First Amendment, and if a reasonably direct and palpable connection between the speech and the military mission or military environment is established, only then need we determine whether criminalization of that speech is justified despite First Amendment concerns. Ultimately, this Court must weigh the gravity of the effect of the speech, discounted by the improbability of its effectiveness on the audience the speaker sought to reach, to determine whether the conviction is warranted. Priest, 21 C.M.A at 570-71; 45 C.M.R. at 344-45. Where, as here, the record did not establish a reasonably direct and palpable connection between the speech and the military at all, let alone the military mission or military environment, the balancing test is mooted by the legal insufficiency of the charged offense.
B. Appellant’s Speech
1. Appellant’s speech as protected speech
Appellant’s various communications on the Internet — which, while repugnant, are not criminal in the civilian world, see Brandenburg, 395 U.S. at 447, 89 S.Ct. 1827 (hold-mg that even advocacy of racist violent speech is protected speech if it is not likely to incite or produce such violence) — did not constitute unprotected “dangerous speech” under the circumstances of this case. No evidence was admitted that showed the communications either “interfere^] with or prevented] the orderly accomplishment of the mission,” or “presented] a clear danger to loyalty, discipline, mission, or morale of the troops.” Brown, 45 M.J. at 395 (citations omitted).
Further, while one might colloquially describe the ideas expressed by Appellant as obscene,[4] they are not legally obscene as defined by First Amendment jurisprudence. See Miller, 413 U.S. at 24-25, 93 S.Ct. 2607 (requiring that the material contain a depiction or description of sexual conduct in a patently offensive way to be considered obscenity). Neither can they be classified as unprotected “fighting words.” See Chaplin-shy, 315 U.S. at 572, 62 S.Ct. 766 (defining “fighting words” as “those which by their very utterance inflict injury or tend to incite an immediate breach of the peace”).
Consequently, we conclude that Appellant’s speech is protected speech under the First Amendment and must now turn to an analysis of whether the Government has shown a reasonably direct and palpable connection between the speech and the military mission or military environment.
2. No evidence of a connection between Appellant’s speech and the military mission
We address the speech at issue in this case in light of the specification alleging Appellant’s offense as modified by the CCA. After modification, the specification alleges that Appellant:
wrongfully advocated anti-government and disloyal sentiments, while identifying himself as a “US Army Paratrooper” on an American OnLine Profile and advocated] racial intolerance by counseling and advis *450 ing individuals on racists views and that under the circumstances, the [Appellant’s] conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.[5]
We must consider the e-mails and instant messages, the forum posts, and the AOL profile statements to determine whether any or all of them was shown to have a reasonably direct and palpable effect on the military mission or military environment. Looking to our prior cases involving speech and Article 134, UCMJ, neither the form, forum, nor substance of Appellant’s speech is clearly analogous to the speech at issue in prior cases examining exigencies of the military service and mission that permitted limitations on the protections of the First Amendment. See, e.g., Parker, 417 U.S. at 736-37, 94 S.Ct. 2547; Priest, 21 C.M.A. at 568, 45 C.M.R. at 342; Gray, 20 C.M.A. at 63, 42 C.M.R. at 255.
The leading cases involving the intersection of Article 134, UCMJ, and the First Amendment have involved facts adduced at trial that showed that the appellant at least attempted to direct his speech to service-members. See, e.g., Parker, 417 U.S. at 761, 94 S.Ct. 2547 (finding a violation of Article 134, UCMJ, when servicemember “publicly urge[d] enlisted personnel to refuse to obey orders”); Brown, 45 M.J. at 398 (holding that organizing a unit-wide meeting to advocate desertion violated Article 134, UCMJ); Priest, 21 C.M.A. at 572, 45 C.M.R. at 346 (finding direct and palpable connection to good order and discipline when the appellant distributed an extremist newspaper at the Pentagon and Navy exchange); Daniels, 19 C.M.A. at 533-35, 42 C.M.R. at 135-37 (concluding that there was a direct connection to good order and discipline when the appellant assembled all African-American members of his unit and attempted to convince them to not fight in “the white man’s war”). Because in those cases the speech was directed to servicemembers, the effect of the speech on the military mission was both palpable and obvious.
We are faced with a very different set of facts in this case. There is no evidence that any of Appellant’s statements were directed at military members or ever reached his unit. And it is pure speculation that the racist views propounded on the Internet by a single person purporting to be a paratrooper either were viewed or would be viewed by other servicemembers or would be perceived by the public or a servicemember as an expression of Army or military policy. We need not tarry long over the private statements made by Appellant through emails and instant messages to a person whom he believed to be a like-minded civilian friend. The Government cites no authority supporting criminal penalties for unpopular and distasteful views made in private between two individuals that fall short of proposing criminal activity.[6] See, e.g., United States v. Williams, — U.S.-, 128 S.Ct. 1830, 1842, 170 L.Ed.2d 650 (2008) (drawing distinction between advocating child pornography and proposals to provide or obtain child pornography).
*451 Moreover, while statements made on an online message board catering to those with anarchistic and racist views may theoretically be more likely to have a direct and palpable effect on the military mission or environment, no evidence of this likelihood or effect was produced at trial, and copies of the postings themselves were excluded based on a hearsay objection that the military judge sustained.
Finally, and for many of the same reasons, there is no evidence that Appellant’s statements in his AOL profiles had a reasonably direct and palpable effect on the military mission or military environment. First, no evidence was produced that the profiles were directed at other members of the military, or that any military member other than the investigators stumbled upon them or was likely to do so. Moreover, one of the profiles was posted in connection with a “love. aol.com” account. Nothing in the record supports the conclusion that the purpose or likely outcome of including the racist statements was anything other than to attract women whose beliefs were similar to Appellant’s own. Nor did the Government provide any evidence that either servicemembers or members of the general public would even understand the source or larger import of the quoted “14 Words” or other language. The experts who testified spoke only to the meaning of the phrases themselves, not to how such statements might be received.
The lower court supported the legal sufficiency of the Article 134, UCMJ, offense by postulating that Appellant’s speech was: (1) service discrediting because “members of the general public have access to appellant’s publicly-posted comments, and upon reading them, may tend to find the Army — as represented by [Ajppellant — a disreputable institution, or one disserving less than full public esteem and respect”; and (2) undermined good order and discipline because “[yjoung, immature soldiers surfing the internet and discovering a U.S. Army paratrooper’s profile advocating anti-government sentiments and extreme racist views could believe such disloyalty and racial intolerance is entirely acceptable conduct in our Army.” Wilcox TV, No. Army 20000876, slip op. at 8-9.
It is telling, given the explicit instructions by this Court and the factfinding power of the CCA, that based on the record of trial this is the best rationale supporting the legal sufficiency of the remaining Article 134, UCMJ, offense available. Of course a rationale supplied by the CCA is not itself evidence. The mere possibility, assumed by the CCA and unsupported by the record, that a servicemember or member of the public might stumble upon Appellant’s expression of his beliefs, believe he was in the military, and attribute his views to the military is so tenuous and speculative as to be legally insufficient to support the second element of the charged violation of Article 134, UCMJ.
3. No balancing required
Having concluded that there is no evidence establishing that Appellant’s speech was either prejudicial to good order and discipline or service discrediting, we are unable to conduct the ultimate balancing of First Amendment considerations and military needs that Priest requires. See O’Connor, 58 M.J. at 455 (similarly declining to examine balance in the absence of record development). Rather, we conclude that there can be no conviction under Article 134, UCMJ, for Appellant’s otherwise protected speech.
III. Decision
It is worth restating that the issue in this case is whether Appellant’s statements constituted a criminal offense in light of the evidence set forth in the record of this case, not whether this Court approves of the statements made by the Appellant. We do not. But condemnation and conviction are drastically different when the First Amendment is involved, and our disagreement with his statements cannot substitute for the Government’s failure to introduce evidence legally sufficient to meet the element of either service discrediting behavior or prejudice to good order and discipline necessary for a conviction under Article 134, UCMJ. While a different record might support a conviction for the offense as charged, because no evidence established the second element of the Article 134, UCMJ, offense in this case, it is *452 clear that no reasonable factfinder could have found the essential elements of the charged offense beyond a reasonable doubt.[7]
The decision of the United States Army Court of Criminal Appeals as to Charge V and its Specification and the sentence is reversed. The findings as to Charge V and its Specification are set aside and that charge and specification are dismissed. The decision is affirmed as to the remaining charges. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals for sentence reassessment on the affirmed charges.

. The granted issue was:
WHETHER THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT A DETERMINATION THAT APPELLANT’S STATEMENTS TO AN UNDERCOVER [CID] AGENT ON THE INTERNET WERE EITHER DETRIMENTAL TO GOOD ORDER AND DISCIPLINE OR OF A NATURE TO BRING DISCREDIT UPON THE ARMED FORCES WHEN THE MILITARY NEXUS REFLECTED IN THE RECORD CONSISTED OF APPELLANT’S REFERENCE TO BEING A “US ARMY PARATROOPER,” AND HIS STATEMENTS RAISE A SIGNIFICANT ISSUE UNDER THE FIRST AMENDMENT.
65 M.J. 335 (C.A.A.F.2007).

. We heard oral argument in this case at Malmstrom Air Force Base, Montana, as part of the Court’s “Project Outreach.” See United States v. Mahoney, 58 M.J. 346, 347 n. 1 (C.A.A.F.2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

. In addition, the Supreme Court and this Court have made it clear that additional burdens may be placed on First Amendment rights in the context of the military, given the different character of the military community and mission. Parker, 417 U.S. at 758, 94 S.Ct. 2547; Priest, 21 C.M.A. at 570-72, 45 C.M.A. at 344-46; Gray, 20 C.M.A. 63, 42 C.M.R. 255. Thus, no one questions that deference must be given to military authorities’ determination that military needs justify particular restrictions on the First Amendment, and that military commanders may enact regulations and take administrative actions that place burdens on, or exact administrative consequences for, speech, expression, and the exercise of religion that would not pass constitutional muster in the civilian context. See, e.g., Goldman v. Weinberger, 475 U.S. 503, 510, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (holding that a letter of reprimand issued for failure to obey a lawful order forbidding the wearing of a yarmulke while in uniform did not violate the First Amendment based on deference to military authorities’ determination of military need for uniformity); Brown v. Glines, 444 U.S. 348, 354-58, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (holding that an Air Force regulation prohibiting distribution of petitions on base without permission did not violate the First Amendment). The instant case involves criminal liability rather than administrative action, however, and the Government has not argued that any regulation prohibits the particular speech at issue in the single specification under Article 134, UCMJ, before us. Rather, Appellant was found not guilty of violating the very regulation enacted to prohibit extremist activity.

. See Miller v. California, 413 U.S. 15, 18 n. 2, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (noting that the dictionary definition of “obscene” includes those things which are " ‘grossly repugnant to the generally accepted notions of what is appropriate’ ” or " 'offensive or revolting as countering or violating some ideal or principle' ”) (citation omitted).

. We note that the prosecution elected not to charge Appellant with the specifically detailed offense of "Disloyal Statements” as articulated in the MCM pt. IV, para. 72. The disloyal statements offense specifically requires the government to prove “[t]hat the statement was made with the intent to promote disloyalty or disaffection toward the United States by any member of the armed forces or to interfere with or impair the loyalty to the United States or good order and discipline of any member of the armed forces ...." MCM pt. IV, para. 72.b.(4). As the President has specifically stated elements of an Article 134, UCMJ, offense relating to disloyal statements, we cannot consider "disloyal statements” as a general Article 134, UCMJ, offense without the Government pleading and proving those elements. Cf. United States v. Harvey, 19 C.M.A. 539, 541, 42 C.M.R. 141, 143 (1970) (noting that "[t]he preemption doctrine prohibits the armed services from eliminating one or more vital elements of a particular offense in order to charge the remaining elements as conduct to the prejudice of good order and discipline”).

. Members of the public are not generally able to view e-mails and instant messenger conversations between individuals, and there is no evidence in the record to suggest that the e-mails and conversations between Appellant and Sturm either were or could be accessed by the public.

. For example, if the Government had introduced evidence focused on the service discrediting nature of the conduct, such as the extra-record material described by the dissent, see 66 M.J. at 459-61 (Baker, J., dissenting), this would be a very different case.